# IN THE COURT OF APPEALS OF IOWA

No. 23-0306
Filed January 10, 2024

**CHAD ALAN TRULLINGER,**
　　Petitioner-Appellant,

**vs.**

**CARRIE LYNN LINDMAN,**
　　Respondent-Appellee.

_____

　　Appeal from the Iowa District Court for Marion County, Brad McCall, Judge.

　　The father appeals a custody decree placing physical care with the child's mother. **AFFIRMED.**

　　Robert L. Stuyvesant of Stuyvesant, Strong, Krapfl and Carda, PLLC, Carlisle, for appellant.

　　Carrie Lynn Lindman, Carroll, self-represented appellee.

　　Considered by Bower, C.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

Chad Trullinger appeals from a custody decree placing physical care of his child with the mother, Carrie Lindman. We affirm the physical-care ruling, finding the child's wishes, Lindman's support of the child's relationship with Trullinger, and a preference for stability and consistency with a primary caregiver support the district court's decree.

## I.     Background Facts and Proceedings

Trullinger and Lindman had a child together in 2012. But Trullinger was absent from the child's life until 2021. During testimony at two different hearings, Trullinger offered little explanation for why he did not develop a relationship with the child during the first ten years of the child's life.

Trullinger is a veteran and served nearly twenty years in the United States Army. As of the custody trial, he worked as a regional manager for auto parts shops in central Iowa. And he was between $25,000 and $30,000 in arrears on child support, which he maintained was due to lapses in employment.

Trullinger's criminal history includes decades-old convictions for burglary in the second degree, an indictable sex offense (the record is inconsistent on the specific charge), and operating a motor vehicle without the owner's consent. Due to the sex offense, Trullinger was placed on the sex-offender registry in the early aughts; he indicated at trial that he was still listed on the registry but believed he should not be. He completed a sex offender treatment program shortly after conviction, and he described the facts of that offense as relating to a "one-night stand type deal" with an older woman when he was twenty-one. He also reported

more recent convictions for failing to update his address, presumably as required by the sex-offender registry, on at least two occasions.

Meanwhile, Lindman worked as a clerk and postmaster for the postal service, picking up shifts as a certified nursing assistant on weekends when she wasn't caring for her child. She described her twenty-year drug-abuse history as an "off and on" problem with smoking methamphetamine. And she reported stopping and starting drug use a number of times around when her children were born. She stopped using when pregnant with the child but started smoking methamphetamine again when the child at issue was approximately six years old, when her paramour brought drugs into the home. At trial, she testified that she had not used since July 2021. Lindman did not have a significant criminal history but was cited by a regulatory agency for not timely reporting abuse at a nursing facility where she worked.

The Iowa Department of Health and Human Services (HHS) became involved with Lindman and the child in 2020 following reports of marijuana use in the home. At trial, Lindman denied that report and explained she had not used marijuana since she was a teenager because she does not "like" the drug. In February 2021, facing eviction after a job opportunity did not pan out, Lindman dropped off her two oldest children and the child at issue in this appeal at her ex-husband's home. After this, Lindman started smoking methamphetamine frequently: "When I didn't have my kids, it was an everyday thing." Despite having confirmed paternity in 2013, Trullinger met the child for the first time in April 2021.

Because both parties were self-represented for some or all the proceedings below, the exact timeline leading up to trial was not clearly developed. The record

establishes that, because of founded HHS reports, the child was placed in Trullinger's care in October 2021, and the child remained with him until the January 2023 trial. During this fifteen-month period, Trullinger was the primary caregiver and Lindman had supervised and then unsupervised visitation.

More recent investigations, for which some reports were entered into evidence, did not find continued drug use by Lindman. A March 2022 investigation prompted by Lindman's ex-husband was closed as not confirmed following Lindman's negative sweat patch test. HHS was concerned that Lindman may have delayed testing to avoid a positive test but could not prove this. HHS investigated Lindman again in October and November at Trullinger's urging. Lindman took hair and urine drug tests, which were negative, and the report was closed as not confirmed. All of Lindman's drug-tests since December 2021 have been negative. She completed outpatient drug treatment in February 2022 and attended weekly therapy.

At trial, Trullinger explained he was requesting physical care because he thought he could "provide [the child] a better life without the risk" of drugs posed by Lindman. He said he was concerned Lindman would start using drugs again based on her history of "constant relapses." Trullinger did not believe shared physical care was feasible because Lindman lived approximately two-and-a-half hours away. And he described his relationship with Lindman as "just kind of blah." He asserted he was not trying to keep the child from Lindman but also admitted he denied Lindman access to the child's school and daycare even after Lindman demonstrated a significant period of sobriety. In Trullinger's words: "I don't trust her one bit."

Lindman testified she was requesting physical care because she had raised the child for the majority of his life and she believed the child wanted to live with her. Lindman explained that she knew she had "done wrong" and was "trying to make amends and change [her] life" so that she could take care of her children. She said she supported future visitation between the child and Trullinger but could not explain why she had never supported visitation or contacted Trullinger during the rest of the child's life. She also explained that the child had friends in the school system where she lived and the child had spent most of his life.

The child's guardian ad litem offered the child's view at the hearing, which we reproduce here because of the weight it was afforded by the district court:

> [T]he child would like to return to his mother's care. I can say that the child just feels closest to his mother with whom he's resided the majority of his life. It's not a situation where he does not like his father and wants to get away from his father. He would like to return to living with his two older sisters [at the mother's home] if at all possible. But even if that doesn't happen, he would like to return to living with his mother.
> He is only ten. His full understanding of drug addiction, it's not as strong as our understanding would be, but, nevertheless, explaining why he was placed where he was, he still would like to return to his mother's care.

The district court ruled from the bench on the questions pertinent to this appeal. The court first found shared physical care unworkable due to the geographic distance between the parties. The court noted Lindman's "extensive extended and significant problem with the use of methamphetamine" and the court's concern that addiction impacted her ability to care for the child in the past and could do so in the future in the event of relapse. Despite this, the court credited Lindman for raising a "kind and happy and caring and polite and well-behaved" child. The court found the child's best interests—including Lindman's support of

Trullinger's relationship with the child and the child's wishes—favored placing physical care with Lindman. And the court imposed a drug-testing obligation for Lindman in the event Trullinger raised reasonable concerns about her drug use.

Trullinger appeals, challenging only the physical-care determination. Lindman, who represented herself through the proceedings, did not file an appellee's brief.

## II.   Standard of Review

"Our review of matters involving child custody and child support is de novo." *Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020). "[W]e examine the entire record and decide anew the issues properly presented." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). "While we are not bound by the fact-findings of the district court, we give them weight, especially as to credibility determinations." *Thorpe*, 949 N.W.2d at 5.

## III.   Discussion

Trullinger casts the physical-care inquiry as a binary choice that centers on his opportunity to parent: "Is it in the child's best interest to return the child to [Lindman]'s custody or was it in [Lindman]'s best interest to have a second chance?" And he urges that the district court decided the case based on Lindman's best interests, rather than the child's.

"The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Although this action is governed by Iowa Code chapter 600B (2021), we look to section 598.41 for guidance. *See* Iowa Code § 600B.40(1) (providing

"section 598.41 shall apply" to chapter 600B proceedings).  In section 598.41, the General Assembly set forth a series of nonexclusive factors to guide our consideration of child custody.  Our case law sets forth similar additional factors. *See In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).  While we afford some weight to the parent who historically acted as the primary caregiver, this factor is not dispositive.  *See Flick v. Stoneburner*, No. 15-1930, 2016 WL 2743449, at *2 (Iowa Ct. App. May 11, 2016) (collecting cases).  Our overriding consideration "is the best interests of the child."  Iowa R. App. P. 6.904(3)(o).

Neither parent has a spotless record.  Lindman's drug-abuse history is deeply concerning, as is Trullinger's criminal history and his status as a sex offender.  Both seem to be capable parents when at their best, but Lindman was undoubtedly a poor caregiver while in the throes of addiction, and Trullinger's absence from nearly all the child's life cannot be overlooked.  Both have also done well by the child despite the other parent's failures—Trullinger stepped up as primary caregiver when Lindman relapsed into methamphetamine addiction, and Lindman was a caring parent during the many years Trullinger was absent.

For the district court, the scales were tipped in favor of placement with Lindman by the child's wishes, Lindman's (admittedly newfound) support of the child's relationship with Trullinger, and the benefits of stability in the child's home life and schooling based on the years Lindman served as the only caregiver. Recognizing there was no easy choice in this case, we see no fault in the district court's analysis.  The factors considered are proper and favor placement with Lindman, even if barely so.  And we recognize concern over Lindman's future drug use should be tempered in small part by the post-decree drug-testing procedure

developed by the district court, which is similar to a procedure we have ordered. *See In re Marriage of Dudney*, No. 22-0182, 2023 WL 1812818, at *3–4 (Iowa Ct. App. Feb. 8, 2023). After deferring to the district court's observations of the evidence and its credibility findings concerning the mother's sobriety, we affirm.

**AFFIRMED.**